Good morning, Your Honor. May it please the panel, my name is William Gantz and I'm here today on behalf of Rapid Displays. We're here today because although the trial court got some of the things right, particularly the decision as to breach of fiduciary duty, the result in the end was unjust and inequitable. Rapid did everything right. They had a claim, they brought a suit, and they were confronted with what can only be deemed is the classic shell game, which the courts have seen in many, many instances and which many cases have been cited to the court. Mr. Gorder was a fiduciary, he breached his duty, he admitted that he breached his duty, and he has not appealed that finding. He also admitted in the trial court. What fiduciary duty does he admit he breached? Well, the trial court's finding, Your Honor, was that Mr. Gorder breached his fiduciary duty for failing to properly liquidate his corporation, which was Insolvent. And what was improper about his liquidation? Well, as we pointed out in the trial court and thoroughly in our briefs, we identified hundreds and hundreds of thousands of dollars worth of assets belonging to his first company, which we've called Old Corp, that were either transferred to himself or transferred to his new company. When we sued him, he started up a new company and shut down the old one, New Corp. Essentially, our suit was to set aside these transfers and to get back the money that Old Corp should have had in its coffers to pay us. In addition, Your Honor, as we've cited. I may have not phrased my question very well. I'm not concerned with the ways in which he breached his duty. I'd like you to state what the duty was. Was it a fiduciary duty owed by him to the creditors to marshal the assets upon his recognition that the company was insolvent? Is that the same duty as the directors owed under Oregon state law? That's what I'm getting at. Yes, I do. I do actually believe it is the same duty because as the court will see in the Gantenbein case, it's cited to the precursor of 60.637, which is the improper distributions to shareholders case. So whether you term it the breach of fiduciary duty or you call it an improper dissolution of the assets when you're dissolving a corporation, those duties are the same. And I think that's a good point. The Gantenbein case also specifies that when you are operating the company in an insolvent state, although it's a going concern, the sole director or shareholder or officer is still going to be required to properly account for and establish the good faith of his dealings with the company. That part of Gantenbein correlates to the rules that are set forth in the Uniform Fraudulent Transfer Act, which Oregon's adopted as set forth in 95.230 and 95.240. The fundamental error that the trial court made was limiting RAPID to what it deemed to be transfers taking place after July of 2001. In a sense, we know that the district court attempted to do some sort of bankruptcy analysis as of July 2001, because that's what the district court has said. As we pointed out in our brief, the four or five things that the court agreed with us on, on transfers, were all transfers taking place after Mr. Gorter got our suit, started up New Corp, and transferred assets. What was ignored in the trial court was the way in which the company was run while it was insolvent, and that dates back all the way to 1997, and certainly by the admission of Mr. Gorter in this case. On May 4, 2000, the day that we contracted with Mr. Gorter's company, they were also insolvent. They had lost money, hundreds of thousands of dollars, in every year prior to that. If on May 4, 2001, at the time you contracted with, as you call it, Old Corp and Gorter, you had the financial statements of Old Corp, which showed losses and was operating as a loss, and you had Gorter's personal financial statements, why didn't you realize the company was insolvent? Well, Your Honor, as the court in Ganton Vine and numerous other, in fact, the fraudulent transfer statute contemplates, there are many corporations which have a balance sheet insolvency but are going concerns. Here Mr. Gorter gave us an indication of his net worth. He had a vested interest in keeping his company going, and there are many companies that people do business with who are in precisely that state. So he gave us also, we also required that we got a third down before we started the job. So we did take certain precautions, but essentially Mr. Gorter displayed that he had a net worth of $3.6 or $3.9 million. The company had significant assets. There was not an overwhelming amount of secure debt. In essence, we knew what the conditions were, of course, because he gave us the information, and that's why we asked for certain precautions. But that doesn't go back to excuse him for the manner in which he actually ran his corporation. But if I understand you correctly, at that point he should have, if he realized he was insolvent, he should have stopped operations, marshaled the assets, and distributed them on an adequate per round share. So therefore, your contract would never have become a contract. Well, I guess looking retrospectively that's possible, but he did enter into the contract with us, and he did give us a down payment. And, Your Honor, I think that there's a distinction to be made here between operating a company and a time when it becomes so bad that you must shut down the company. And I think that's a distinction that the district court confused. Mr. Gorter, because his company was insolvent when he contracted with us, had the particular responsibility to deal with his company in good faith. And one of the recent decisions that the panel has asked us for a supplemental brief on, the Houston's case. Which I don't have a copy of. I don't know if my colleagues do. Did you file one? We did file a supplemental brief with the court, Your Honor. I think I'm going to have it here. Okay, fine. I'll be happy to provide more copies. You have a 28-J letter where you raise Hamilton. Yes. That was today. That was today, Your Honor. We discovered Judge Gould's opinion in this regard. I neglected to mention I would like to reserve three minutes. Just tell me whether you think the Houston case, because I don't have your brief. Yes, sir. Your opponent says it doesn't apply because they were not undercapitalized from inception. There was a second prong about disinterested lender to that case. Do you think, is your position that that case does or doesn't apply? I think it certainly applies, because the plaintiff in that case brought some of the same claims that we dealt with. And the analysis here is the defendants in that case, or the parent company and the officers, had given advances in the form of inventory and goods. Here, Mr. Gorder gave certain advances to keep the company afloat and keep it a going concern. That's precisely what the district court in this case actually made one correct finding, in fact, that I agree with, when he found that Mr. Gorder's money kept the company afloat. The decision in Houston is actually right on point here, because where you are putting in money to keep it afloat, you are actually gambling on the outcome. And if the company does well, you'll take a reward in its operations. So you don't read the statement from that case that Mr. Gorder relies upon, that it only applies in the case of an undercapitalized company that's undercapitalized from the get-go? No, and that's the point of the Gantenbein case. It's the point of the Fraudulent Transfer Act. At any point that you're running a company that's insolvent, you have these duties to act properly. And, in fact, the Houston case was interesting, because it didn't specify that the shareholder had to feel in good faith and establish that based upon a breach of fiduciary duty. That wasn't even raised by the plaintiff in that case. The Houston case has a two-pronged test. One can be, quote, a shareholder loan as a capital contribution if it is made to an initially capitalized corporation, dot, dot, dot, or when no disinterested lender would have extended credit. Correct? That's correct, Your Honor. So you say that the second prong applies here. Yes, sir. Now, is there any evidence in this record, and if so, please point out to me, that the corporation, i.e., what you call the old corporation, was undercapitalized, and if so, when? Again, Your Honor, based upon the admissions and the balance sheets and the financial statements and the long history. No, that's not what I meant. That's circumstantial evidence. I suppose what I should have said more precisely was, did you have an expert witness, an economist, or an accountant, testify that on a date certain based on the financial statements, a business of this volume was undercapitalized for the purposes under which it was incorporated? No, Your Honor. Mr. Gorter admitted as of May 4th that his company was insolvent. That's not the same as being undercapitalized. You can be undercapitalized from the get-go, as Judge Fischer says. That's one issue. But you can still be solvent. I think if you read the Houston's case with the Gantenbein case and the fraudulent transfer statutes, whether the company's insolvent or undercapitalized at a particular moment means that it's unable to pay its debts. It has a balance sheet insolvency. I think that's the case. Do you equate the undercapitalized and insolvent? Well, in terms of undercapitalization, the term undercapitalization implies that from the beginning of time when the company was formed, it was undercapitalized. We don't have that information from Mr. Gorter's company because it had been in existence for 20-plus years. What we do know is that it was insolvent at all times that he was dealing with us. Was this Oregon case law provided to the district court in this case? The Houston's case, regrettably, was not, Your Honor. We certainly did argue that the loans were not properly documented, that they could not be called loans, that he was simply advancing money to keep the company alive. We made all of the arguments, but we did not cite that specific case. How about Gantenbein? Gantenbein was front and center in the district court. How about Hartman? Was that also? Hartman, I do not believe, was presented to the district court. Now, what Gantenbein and the Fraudulent Transfer Acts and everything else tells us is that when we proved our case, Mr. Gorter had a burden to come in and establish the good faith of his transactions because he was the sole shareholder, director, and officer of the company, both during times it was being dissolved and while it was being operated as an insolvent company, nonetheless. Now, we have lots of exhibits, and I know we've probably overloaded this matter with facts and documents, but there's some important ones. What did we do? We got a bunch of documents, and we went through all the documents and ledgers, and we tried to guess and come about transactions and transfers. We were the bloodhounds in this. Mr. Gorter dumped his documents on us in discovery. We went through them, and we provided affidavits, and the result of it, Your Honor, was tabs 105, and that was the basic list of all the things that we found that were transferred improperly. Now, the amounts of these transfers, and these are things that were really never accounted for. The accounting, the entire accounting that we got in the district court, is a document which was produced at trial, not in discovery, by Mr. Tobey, who is the controller of both Old Corp. and New Corp., and that's at tab 116. There was never any explanation or accounting for any of the claimed loans. We never got information about when, where, how, who, for what reason. Any of that basic information. There was a Ray loan file that Penny Kelly said she maintained, which she never produced. One amazing example is that there was never any accounting for over $500,000 of personal expenses where we found things just in the three-year period of time that we had records that had been milked out of Old Corp. because Mr. Gorter was paying his personal bills or non-Old Corp. business bills through the company. Those amounts exceeded the amount that the district court ultimately even found as loans, and that was Mr. Gorter's justification for taking the money and doing all these things that he did in commingling. What would you have us do? Your Honor, we would have you on multiple theories because we produced hundreds and hundreds of thousands of dollars of transfers in excess of what we were owed, in excess of what the other creditors were owed, and in fact, in excess of what Mr. Gorter, the district court, found he was owed. All of that adds up to about $890,000. We had transfers well above that that Mr. Gorter didn't account for. That means this court, as a matter of law, because there was no accounting for these transfers, can enter the judgment in full for us. This is what happened in the multiple cases such as Houston's. The defrauded and the disappointed judgment creditor proves that there are assets that were transferred vastly in excess of what they were owed, and they recovered in full. One of the interesting things that I hope the panel found interesting, but on page 32 of our brief, we took the trouble to actually do a prorated distribution that had the court, I just wanted to see if we used the district court's actual factual findings, we used Mr. Gorter's actual findings for what he paid his creditors over time. You may remember, and I'll give you the tab number, but Mr. Tobey set out to determine and prove on behalf of Mr. Gorter that from May 1 of 2000, just three days before we contracted, they actually paid all of their other creditors 95 plus percent on the dollar. That's tab 112. We added our receivable back in. We used the actual findings of fact for the approximately $300,000 that the district court did find was improperly transferred, and we actually used Mr. Gorter's numbers for all of his receivables and what he paid, and when we added it all together, we would have been paid 97.1 percent. So if the court here is looking for an alternative, it should find that the district court, if it wanted to do a prorated distribution, should have done it as of May 4, 2000, and the evidence provided by Mr. Gorter in using the trial court's findings of fact would have put us in a situation where just under the breach of fiduciary duty claim, we would have gotten 97.1 percent and we probably wouldn't have been here except for the issues that we have raised on our attorney's fees. You want us to do a prorated distribution a year before your contract was entered into? No, our contract was entered on May 4, 2000. Oh, I thought it was 2001. No, I'm sorry, Your Honor, if I misspoke. May 4, 2000 was our date of contract. They provided the evidence that showed that they paid 95 percent on the dollar from May 1 of 2000 until the end of time, and we don't ever really know what time the end of time is because there was no real liquidation, and the district court actually didn't find when he specifically turned it down. You know, I don't know what the views of the panel will be, and I haven't decided the principles yet myself, but normally even if we agreed with you on the law, we would not get into kind of a fact-intensive calculation as an appellate court. All we would do is declare the law and remand it to the district court for further proceedings consistent with our opinion. I'm running short on time, but I'd like to respond. I agree that the findings of fact are subject to the clear error standard, and there must be a fundamental mistake, but here we have a trial court who misinterpreted the law on how to do the pro rata distribution, misinterpreted the law on what the fiduciary duty meant, and misinterpreted the law on how Mr. Gorder was required to account. Well, if we said what the law was, is there any reason to think the district court couldn't follow the law as we stated it? Well, that's why we've also maintained that there are clear errors of fact, and there are a lot of non-findings, but the fundamental error here is calling it a day on July 31st, 2001, and not well into the future. That's what the court fundamentally got wrong, so that was clear error, and it was also a misunderstanding of the law to try to do a faux bankruptcy. That's a misunderstanding of the law, and it's a mistake of law, and this court can reverse that de novo. I've suggested ways that this court can. Why don't you save your time? I think we have the idea. Yes, sir. Thank you. May it please the Court, Dave Sweeney for Respondent, Cross-Appellant Ray Gorder. This was a fact-intensive case tried by a U.S. magistrate. I note that my colleague states that the fundamental error was that the trial court held that the timing in this matter was July 31st, 2001. In fact, the trial court held that Mr. Gorder knew that the company was insolvent on May 10th, 2001, not late July. There were two pivotal factual findings that occurred in this case. This case involved interesting exhibits, and Mr. Gorder, who is the president and shareholder of Interesting Exhibits, a company that lasted over 20 years, had excellent clients, and when they entered into the contract with Rapid Display, gave them a balance sheet which displayed accurately what their financial situation was, including a reference to a note-payable shareholder of over $495,000. Now, the trial court here made two pivotal factual findings. One, were these infusions by Mr. Gorder, were they loans or were they capital contributions? That's a fact issue. And the trial court heard testimony from Mr. Gorder. They heard testimony from the chief financial officer of the company. They heard testimony from the outside accountant of the company. They heard testimony from the chief corporate counsel for the company. They had documentary evidence showing that the loans were, in fact, evidenced on the books of the corporations. Excuse me, did anybody argue to the judge that these were capital contributions? Oh, absolutely. Okay, but we've heard that at least one of the relevant Oregon cases and the federal case, neither of those were cited. It was all under Gantenbein. Is that it? Gantenbein doesn't deal with the issue of loans versus capital contributions. Gantenbein deals with the issue of at what point does your obligation as a fiduciary kick in? When does that occur? And the issue of loans versus capital contributions was front and center in front of the trial judge. That was an issue that he had to determine that was critical because if, in fact, these were not loans, then Mr. Gorder would not be repaid any of the amounts. Those would not have been appropriate. Mr. Gorder loaned this company over $1.3 million over the course of its activities. As I was trying the case, and it's reflected in the record, the trial judge looked out and he smiled. In the record it says, you may wonder why I'm smiling because this is an unusual case. Most of the time I'm dealing with cases where people are trying to save their own skin. But here Mr. Gorder is continuing to place money into the corporation. In fact, he placed over $200,000 into the corporation in the year 2001 alone. The trial judge held that on early May, May 10, 2001, Mr. Gorder knew that the company was insolvent. So that's when the trust fund theory kicks in at that point. That's the purpose of Antenbein. Antenbein says the test is, the fact test is, that the company must discontinue business by reason of its insolvency. And what happened in May 2001 that the trial judge was looking at to make this determination? What happened was that there was, in fact, outside financing for this company, unlike the Houston case. And it was from Key Bank. There was approximately $50,000 worth of equity on that line of credit. But in May 2001, Key Bank decided they gave the note over to special assets. That meant collect the note. It was a demand note. And at that point a meeting was held with the outside accountant, Mr. Mack, who testified, with the corporate counsel, Mr. DeSilvia. And at that point, Mr. Gorder was told, in essence, this company can no longer survive. It was that May period of time that Judge Gelders determined that Mr. Gorder then knew that the company was insolvent. Judge Gelders saw Mr. Gorder. He acknowledged in his findings of fact that Mr. Gorder was unschooled in accounting, in law, that he relied on his professionals, and that without his loans, this company would not have survived. And, in fact, when Mr. DeSilvia, the outside counsel, was testifying, the trial judge says, now this time period may be important to me. I want to make sure I understand the sequence in May. And then in his decision, it was that sequence in May that triggered that finding that Mr. Gorder knew insolvency of his company occurred in May 10th. And that's in the findings of fact. And from that point forward, then, his fiduciary duty occurred. Now, it's also, the trial judge puts assets back into the pot so that the thing. Before you go to that. Sure. As of the time when Gorder knew that his company was insolvent, any loans that he made after that time should be treated as capital apportations, correct? Well, certainly. You don't agree with that? I think as a strict construct of law, perhaps, that's correct. You want us to apply a loose construct? Well, no, I guess my counsel's arguing equity. And here's a fellow, if you can imagine, that his company of 20 years is now going down the drain, and he's still trying to put money into it to save it. And Judge Shelders found, the trial court found. But under the Hinton rule, the second rule, if he has reason to believe that the company is insolvent at that point, you don't consider, I mean, he's got a duty to marshal up the assets as of that point. And any further money he's giving is to an insolvent corporation. So he may be trying to save his name, but he shouldn't be expecting to see it back. In this situation, I believe Judge Shelders would have applied that rubric. And I believe that that's. I didn't mean to stop you on the other one. You don't have any problem with the disgorgement of $188,000 for the boat and the beach house deed? No. And what happened there was that it was improperly on the balance sheet in the first place. It was taken off after that balance sheet had been given to Rapid Display. The trial court said, hey, Rapid Display saw this on there, so you're stopped from saying it wasn't there. Not that it was a fraudulent misrepresentation. In fact, the trial court said it was clearly not. And our only point in cross-appeal is that if you're going to put that back in, you need to correspondingly put the debt back into Gorter as well. That's the only issue. The debt issued after May 1st, 2001? Pardon me? You mean the debt issued after 2001? That if the trial judge, and our point on cross-appeal is, is if you stick that beach house and the boat back in, the pot for creditors, then it has a corresponding debt at the same time to Mr. Gorter that should go on his side of the debt column. Unless the debt given by Mr. Gorter was when he knew the company was insolvent. Right. And we don't believe that occurred. We believe that the beach house and the boat were taken off prior to May 1st, 2001. Well, he made two loans after, pardon me, didn't he make a loan of $229,000 between 12-31-2005-10-01? I'm going to have to rely on the record, Your Honor. I don't have it in front of me. I'm going to avoid, at the suggestion of Judge Gould, getting into details like that. Leave that to the trial judge. But it's our principal position on this appeal, that it was a fact-bound case that had two critical factual underpinnings to it. One, that these were loans rather than capital contributions. Two, that, in fact, under Gantenbein and under common law principles, the trial judge made a very clear analysis of when that fiduciary responsibility occurred, and it was early May 2001. The trial judge had an analysis by the chief financial officer that he used. I'm still trying then to understand how you want us to end Ron Huston and that principal and say that anything, any capital contribution made after he was aware should not be treated as, excuse me, any advancement of money, loan, whatever, should be treated as other than as a capital contribution. What's your theory? Again, why? Given your acknowledgment that as of May 10, 2000... No, no, May 10, 2001, Your Honor. The trial judge... Yes. May 10, 2001, that any monies after that date that Mr. Gorder loaned to the corporation, which I understood to be about $100,000 would be treated as a capital contribution, contrary to what Judge Sheldrake found. I don't recall how Judge Sheldrake treated those monies post-May 2001. But in light of the law, that would seem to be pretty much have to be, given what you acknowledge, that the trust fund duty applied at that time. Absolutely, Your Honor. All right. I think we have your point. The trial judge had accounting by the chief financial officer, and the trial judge spent a significant period of time, as cited in our supplemental record, examining directly, as is his power to do so, the chief financial officer as to how the accounting records worked, how the loans were booked to Mr. Gorder. And the trial judge was entitled to rely on that testimony. The countervailing evidence was prepared by a paralegal that was admitted simply to, as the trial judge says, to try to make the record make sense, but not for, as I understand it, the proof of the underlying calculations or the information. This is not a fraudulent transfer under Oregon State statutes, because there was contemporaneous value given the loans that occurred. This was not an asset, because the materials and assets of the company were encumbered by the key bank loans, so in terms of the statute, it doesn't apply. This was not an improper shareholder distribution, because it wasn't a distribution. It wasn't in regards to a shareholder. These, in fact, were loans. The equitable subordination argument, I have only seen advanced ever in an admiralty case, and that's the only time I've ever seen it occur. It requires inequitable conduct, and that inequitable conduct did not occur. Judge Gelderks, I think, went out of his way to indicate that this conduct was not inequitable. In fact, the fiduciary duty, Judge Gelderks found that Mr. Gordon was not told of his obligations under, to marshal assets and to do an orderly liquidation. Now, this doesn't excuse a shareholder from doing that once that point in time is achieved, but nonetheless, in terms of culpability, in terms of that analysis. Could I go to the issue of punitive damages and attorney's fees? The issue of punitive damages and attorney's fees, there was no substantive basis for attorney's fees in this case. It doesn't exist. It's not an Oregon common law, nor in the statutes. In terms of punitive damages, punitive damages were never pled in this case. In fact, when the trial counsel said, well, let's bifurcate this, I said to the trial judge, punitive damages aren't pled in this case, so they're simply not there. So the record in terms of Mr. Gordon's culpability is closed. Punitive damages were never pled. There's no substantive basis for an award of attorney fees here. There's no vindication of a constitutional right, creation of a pool of assets for others to share in. The right to attorney fees may, in some instances, if you're seeking the attorney fees you spent in the prior litigation, but the prior litigation was against the corporation, not against Mr. Gordon. I have a question on one of your earlier points. Were there improper shareholder distributions if loans were repaid that were made after the date when Mr. Gordon knew of insolvency? Because I believe in that instance the distributions have to be because of Mr. Gordon's shareholder status. You're a shareholder, therefore I'm going to distribute X dollars to you, given your status. That simply did not occur. These were loans that were repaid, and in fact the loans or the monies that went in in late 2001, certainly if you're talking about a first-in-first-out analysis, were never repaid, because the trial judge found that Mr. Gordon was still owed over $395,000 at the end of the day. In answer to Judge Gould's question, you mean unless the repayment were stamped dividend, then it's not an improper distribution of shareholders if he's the sole shareholder? I don't think that these were shareholder distributions in the sense of the definition. No, I don't. It was a distribution to the only shareholder. That's correct. You said that punitive damages wasn't pled, and yet I'm looking at the transcript of the pretrial trial before you bifurcated the trial. Mr. Gants is saying we pleaded the right to recover attorney fees as well as punitive damages, and the Court says okay, without prejudice, but either attorney fees or punitive damages I'll allow you to reserve putting on any testimony or making any argument on those two issues until the underlying liability issues have been resolved. Take a look at the First Amendment complaint. It's not there. No punitive damages. Well, the pretrial conference seemed to think it was. If that was the conference immediately before trial, I believe I stated, and I was inserted in this case late, I think I told the judge that. I said, Your Honor, there are no punitive damages that I'm aware of that have been pled in the case. Okay, you did raise that. I don't recall specifically. And you said there was no organic basis for an attorney fees claim? No. Okay, well, we'll see what the counsel says. There was a bifurcation order issue, right? The order that you, that's what I recall the Court doing, what the transcript said. Okay. Thank you. There's no formal pretrial order apart from that transcript. I wondered, is there a formal pretrial order? And it's a good question. There is law, I think, or at least there used to be when I did litigation a number of years back, that a pretrial order supersedes the pleading. Sure. So that if a pretrial order said punitive damages, once that happened, even if they weren't in the complaint. I don't believe there was a pretrial order here. I got involved just before the trial. I should know the answer, but I don't think that there was. So for those reasons, Your Honor, we believe that with the exception of our issue on cross-appeal, the judgment of the trial court should be sustained. And what relief do you wish on your cross-appeal? Cross-appeal, the judgment against Mr. Gorter personally should be reduced by slightly over $4,000. I just have a couple minutes, so I'm going to go as quickly as I can. The definition of distribution under the transfer of the Distribution Act is 60.017. It means a direct or indirect transfer of money or other property. That's a broad definition. It covers any type of distribution. The idea that my clients have waived the protections of the Fraudulent Transfer Act or the fiduciary duties because we knew that the company had a negative balance sheet isn't square with the law. Otherwise, no one would do any business with a going concern that it's operating as an insolvent. The trial court made numerous errors of fact and clear errors. One is if you look at page 12 of the Conclusions of Law and Findings of Fact, the court finds that there were overpayments on leases, that Old Corp. didn't receive revenues, and it paid for repairs for properties that Gorter owned. We identified $488,000 that had added up to $488,000. My reference for that is tab 1069 and Duncan's testimony. Mr. Tobey came back and said the entire amount of rents due. They tried to offset that claim with rents. By his testimony, it was $96,000. There was no finding in our favor as to the differential. That's $300,000-plus that would have been available to us. The issue here is not what came in and out. It's globally what happened, and we are entitled to have a prorated distribution. There was $568,000 in accounts receivable, not accounted for. There was a receivable for $43,000 that his, Mr. Gorter, Judy Walsh, acknowledged was received, but it vanished into thin air. The trial court's problem is that it didn't make proper findings of fact, and it missed. It missed the boat. It didn't even rule. At that point, in terms of punitive damages and attorney fees, punitives are not in the first amendment complaint, not specifically anyway, but you do ask for attorney fees. So what's the status of the record on first punitive damages? There was no pretrial order. We filed an amended complaint. We felt at the pretrial that our claims and the evidence that we were going to see would sustain our action or our claim for punitive damages. So that's all you've got is just what you said, that you thought you had a punitive damage claim, and when challenged, you said you'd have to go back and take a look. That's the state of the record? That's correct, Your Honor, and there was never any— As far as attorney fees, what's your basis for attorney fees? Attorney fees, Your Honor, in a couple cases I'd like to cite, too. Are these also new cases that haven't been cited previously? These are cases that we cited in our—we never got an opportunity to brief the issue. To us. To us. Have you cited them before? These are in our brief, Your Honor. Just give me the name. Osborne v. Hay. That's fine. Which adopted the restatement of Torts 591. I do not have to. Okay. Just cite. Osborne v. Hay. Okay. Got that. And there's a table of cases I want to save my clerks some time having to track them down. Oxenholt v. Lederle. Thank you. One last question. I'm sorry, there are a couple more. Disick v. Umpqua and Medford Irrigation. And also I'd like to point out that ORS 95.261C allows for any other relief the circumstances require. We've got no equity here unless we get our expenses from this case. One last question, counsel. As to punitive damages, at the end of the evidence, did you make a motion to amend your complaint to include punitive damages based on the proof? No, I did not, Your Honor. It was never challenged after we started the trial. Is Oregon law, well, it was challenged at the pretrial conference, but does Oregon law require specific pleading of punitive damages? In other words, you have to specifically request that you can't. It doesn't come under such other relief as maybe just improper. You know, I don't know the answer to that question, and I'd be happy to look into it and provide the court with a short brief on that. If necessary, we'll ask. Okay. The case is argued and submitted.
judges: Fisher, Gould, Bea